IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JEFFREY NEYLON, | ) | |
| | ) | |
| Plaintiff, | ) | 4:17CV3153 |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM** |
| BNSF RAILWAY CO., | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Jeffrey Neylon brings this lawsuit under 49 U.S.C. § 20109 of the Federal Railroad Safety Act ("FRSA") which, among other things, prohibits railroads from discriminating against, suspending, or discharging an employee for notifying or attempting to notify the railroad about a work-related illness or injury. Neylon alleges that his former employer, Defendant BNSF, terminated his employment for engaging in protected activity under 49 U.S.C. § 20109(a)(4)—that is, reporting to BNSF an ankle injury that he speculated occurred while climbing onto a train in the course of his employment as a BNSF conductor 17 months earlier. (Filing No. 1 at CM/ECF pp. 2-3, 5.) Neylon requests reinstatement, expungement of any BNSF record of misconduct, compensatory and punitive damages, and costs. (Filing No. 1 at CM/ECF p. 6.)

## I. PROCEDURAL BACKGROUND

This court previously granted Defendant BNSF's Motion for Summary Judgment (Filing No. 83) on Neylon's section 20109(c)(2) medical-treatment claim and dismissed such claim as abandoned due to Neylon's failure to address any of BNSF's arguments regarding section 20109(c)(2). After a discovery dispute arose regarding evidence submitted on the Motion for Summary Judgment as to Neylon's section 20109(a)(4) injury-reporting claim, giving rise to a Motion for Sanctions, this court denied BNSF's Motion for Summary Judgment on the section 20109(a)(4) claim

without prejudice to reassertion following the Magistrate Judge's ruling on Neylon's Motion for Sanctions.[1]

After the Magistrate Judge denied the Motion for Sanctions and gave Neylon time to file a motion to reopen discovery (Filing No. 117) (which Neylon declined to do), BNSF filed a Motion to Reassert and Submit Defendant's Motion for Summary Judgment (Filing No. 118) seeking to reactivate BNSF's prior Motion for Summary Judgment (Filing No. 83) along with its accompanying briefs and evidence. In response, Neylon filed additional evidence (Filing Nos. 120, 121). The court granted BNSF's Motion to Reassert and Submit Defendant's Motion for Summary Judgment and characterized it as a pending Motion for Summary Judgment on Neylon's 49 U.S.C. § 20109(a)(4) injury-reporting claim, which is now ripe for resolution.

---

[1]Neylon's Motion for Sanctions primarily asserted "that Defendant failed to produce two documents that Defendant used (and likely will use again) to support its motion for summary judgment, specifically (1) Defendant's Policy for Employee Performance Accountability ("PEPA policy") and (2) comparator evidence." (Filing No. 117 at CM/ECF p. 2 (Magistrate Judge's order summarizing Motion for Sanctions and evidence at issue).) In denying the Neylon's Motion for Sanctions, the Magistrate Judge found that:

> Plaintiff had ample time and opportunity to cure any alleged prejudice caused by any production delay. . . . Upon receipt of the two documents Defendant used to support its motion for summary judgment, Plaintiff did not seek to enlarge the discovery period or conduct additional discovery. Although Defendant offered to allow further discovery, Plaintiff declined to do so. Further, Plaintiff did not seek an extension of time to respond to Defendant's summary judgment motion or request leave to conduct additional discovery before responding to the summary judgment motion. Rather, over a month after briefing on the summary judgment motion was complete, Plaintiff decided to file the instant motion, requesting that the Court deny the motion for summary judgment filed months earlier.

(Filing No. 117 at CM/ECF pp. 3-4.)

## II. FACTUAL BACKGROUND

Distilled from the parties' briefs and the evidence cited therein are the following undisputed material facts:

### Injury-Reporting Regulations, Policies, and Rules

1.      The Federal Railroad Administration ("FRA") has enacted regulations requiring railroads to report injuries. *See* 49 C.F.R. Part 225.

2.      As mandated by the FRA, Defendant BNSF has an Internal Control Plan "to assure the complete and accurate reporting of all accidents, incidents and occupational illnesses arising from the operation of BNSF Railway Company, in full compliance with the letter and spirit of FRA's accident reporting regulations." (Filing No. 85-7 at CM/ECF p. 1.)

3.      The Internal Control Plan provides for discipline, up to dismissal, for any BNSF management employee who engages in "harassment or intimidation of any person that is calculated to discourage or prevent such person from receiving proper medical treatment or from reporting such accident, incident, injury or illness." (Filing No. 85-7 at CM/ECF p. 2.)[2]

4.      The Internal Control Plan also states that "BNSF Safety Rules require timely reporting of all injuries and incidents." (Filing No. 85-7 at CM/ECF p. 5.)

5.      BNSF also has an Injury Reporting Policy that requires management employees to accept all injury reports, whether they are verbal or written, and to report

---

[2]Neylon's "objections" (Filing No. 95 at CM/ECF pp. 4-5) to this proposed fact regarding the lack of management training and plan enforcement do not controvert the fact that this is the language of the plan.

all injuries, even where no medical treatment is required. (Filing No. 85-8 at CM/ECF p. 1.)

6.      For non-acute injuries, the Injury Reporting Policy provides that employees have up to 72 hours to report "muscular aches and pains from 'routine' work that do not appear to be serious when they first occur . . . ." (Filing No. 85-8 at CM/ECF p. 2.)[3]

7.      BNSF has multiple company rules that require employees to timely report work-related injuries, including the General Code of Operating Rules ("GCOR") 1.1.3 (employees must "[r]eport by the first means of communication any . . . personal injuries . . . ."); 1.2.5 ("All cases of personal injury, while on duty or on company property, must be immediately reported to the proper manager and the prescribed form completed."); and 1.2.7 ("Employees must not withhold information, or fail to give all the facts to those authorized to receive information regarding . . . personal injuries . . . ."). (Filing No. 85-24; Filing No. 85-27 at CM/ECF p. 1.)

**BNSF's Discipline Policy**

8.      BNSF has a progressive discipline policy known as the Policy for Employee Performance Accountability ("PEPA"). (Filing No. 85-10.)[4]

---

[3] Again, Neylon's objections (Filing No. 95 at CM/ECF p. 5) do not controvert the language of the Injury Reporting Policy.

[4] Neylon's objections to proposed material facts regarding the PEPA and comparator evidence are overruled because the Magistrate Judge found, in the context of Neylon's Motion for Sanctions, that to the extent Plaintiff suffered any prejudice by the alleged late production of this evidence, "Plaintiff had ample time and opportunity to cure any alleged prejudice," and he failed to do so. (Filing No. 117 at CM/ECF p. 3.) Further, Neylon declined the Magistrate Judge's invitation to file a motion to re-open discovery with regard to such evidence.

9.     Under the PEPA, rule violations are categorized as Standard Violations, Serious Violations ("Level-S" violations), and Stand-Alone Dismissible Violations. (Filing No. 85-10 at CM/ECF pp. 3-4.)

10.     Under the PEPA, Serious Rule Violations include the following:

Late reporting of accident or injury. **Note:** Employees will not be disciplined for "late reporting" of muscular-skeletal injuries, as long as the injury is reported within 72 hours of the probable triggering event, the employee notifies the supervisor before seeking medical attention, and the medical attention verifies that the injury was most likely linked to the event specified.

(Filing No. 85-10 at CM/ECF p. 5.)

11.     Under the PEPA, an employee's first Level-S violation results in a 30-day record suspension and a review period of 36 months. (Filing No. 85-10 at CM/ECF p. 4.)

12.     A second Level-S violation committed within the applicable review period may result in dismissal.  (Filing No. 85-10 at CM/ECF p. 4.)

**Neylon's Training, Experience, and Collective Bargaining Agreement**

13.     On February 25, 2002, BNSF hired Neylon as a conductor. (Filing No. 85-11 at CM/ECF p. 1.)

14.     Neylon was trained and tested on GCOR rules. (Filing No. 85-13, Dep. Neylon at 66:9-10.)

15.     Neylon understood that BNSF's rules required him to notify his supervisor immediately if he was hurt at work. (Filing No. 85-13, Dep. Neylon at

67:2-12; Filing No. 85-33 at 7:5-20.) Neylon understood that "[i]f I were to have an acute injury on a specific day, a year and a half later that would be a violation of the rules if I did not report it." (Filing No. 96-4, Dep. Neylon at 172:11-14.) Neylon believes that BNSF "requires you to report acute injuries," but not "every ache and pain." (*Id*. at 172:20-25.) Neylon does not think BNSF has "ever in any way instructed [him regarding] what constitutes a reportable injury . . . versus an ache and pain that [he does] not need to report." (*Id*. at 173:11-15.)

16.    Neylon's employment was governed by a collective bargaining agreement ("CBA"), which provided employees with "a fair and impartial hearing" prior to any discharge, suspension, or other discipline. (Filing No. 85-21.) With regard to the incident at issue, Neylon and his union representative testified they were provided the rights afforded to Neylon under his CBA. (Filing No. 85-13, Dep. Neylon at 119:19-121:1, 122:8-16; Filing Nos. 85-16 to 85-30; Filing No. 85-35, Dep. Trauernicht at 17:1-18:25.)

17.    The CBA ensured that Neylon received timely written notice of the investigation hearing

> within a reasonable period of time but not to exceed ten (10) days from the date of occurrence, or where the occurrence is of a nature not immediately known to the employee's supervisor(s), *from the time they first have knowledge thereof.*

(Filing No. 85-21 (emphasis added).)

18.    In 2005, prior to the injury in question, Neylon reported an off-duty (non-work-related) injury to BNSF and was not disciplined. (Filing No. 85-13, Dep. Neylon at 57:4-59:11.)

19.    Likewise, in 2011 Neylon reported an on-duty (work-related) injury to

BNSF and was not disciplined. (Filing No. 85-11 at CM/ECF p. 2; Filing No. 85-13, Dep. Neylon at 59:12-25, 63:13-22.) Neylon testified that a claim agent handling his 2011 injury told Neylon that all injuries "are . . . kept on record and . . . are compounded. And multiple . . . injuries could be subject to punishment." (Filing No. 96-4, Dep. Neylon at 174:20-175:6.) Neylon understood from the agent's comment that he "could be disciplined" for reporting injuries. (*Id*. at 175:7-11.)

20.     Prior to the discipline at issue, on September 26, 2014, Neylon signed a waiver of formal investigation for a Level-S violation and received a 30-day record suspension with a three-year review period. (Filing No. 85-11 at CM/ECF p. 2; Filing No. 85-12; Filing No. 85-13, Dep. Neylon at 54:18-55:19, 56:7-57:3.)

21.     Under the PEPA, Neylon was subject to dismissal if he received another Level-S violation before his three-year review period expired on September 26, 2017. (Filing No. 85-10 at CM/ECF p. 4; Filing No. 85-11 at CM/ECF p. 2; Filing No. 85-12.)

### Neylon's Unreported Work Injury, Symptoms, and Treatment

22.     In June 2015, Neylon was working as a hostler in BNSF's yard in Lincoln, Nebraska. (Filing No. 85-13, Dep. Neylon at 95:18-96:12.)

23.     He attempted to step up on a locomotive and felt a pop in his left Achilles. (Filing No. 85-13, Dep. Neylon at 80:17-20, 81:10-82:4, 83:4-8, 91:3-7, 95:18-25, 96:13-24, 106:4-13, 175:22-176:3.)

24.     He immediately felt sharp pain in his left Achilles that caused him to kneel down for five to ten seconds. (Filing No. 85-13, Dep. Neylon at 80:20-21, 82:5-22.) Neylon testified that the pain lasted less than a minute, after which he was able to finish his shift. (Filing No. 96-4, Dep. Neylon at 96:23-97:1.)

25.     Despite the immediate pain, Neylon did not report his left Achilles injury to a BNSF supervisor in June 2015 because he "didn't think anything was wrong." (Filing No. 96-4, Dep. Neylon at 97:19-21.)

26.     By the fall of 2015, Neylon was having intermittent pain, soreness, and tightness in his left Achilles, but "it would go away." (Filing No. 85-13, Dep. Neylon at 79:16-25, 85:19-24, 97:22-99:1, 101:12-15.)

27.     On November 18, 2015, Neylon saw his primary-care physician, Dr. Sabrina Cerny, for back pain. During the visit, he reported a "previous injury of R [right] achilles and pain in L [left] achilles." (Filing No. 86-1 at CM/ECF p. 4; Filing No. 85-13, Dep. Neylon at 73:5-74:16; Filing No. 85-14, Dep. Cerny at 9:13-10:14, 12:16-13:11.)

28.     During the fall of 2015, Neylon did not report to a BNSF supervisor that he was having intermittent pain, soreness, and tightness in his left Achilles. (Filing No. 85-13, Dep. Neylon at 100:10-16.)

29.     By the following year, in September 2016, Neylon was experiencing pain and swelling daily, and he had developed a lump in his left Achilles that required him to lie in bed, ice and rest his Achilles, and take ibuprofen. (Filing No. 85-13, Dep. Neylon at 85:25-86:23, 98:3-100:9.)

30.     Between September and November 4, 2016, Neylon did not report to a BNSF supervisor that he was experiencing pain and swelling daily or that he had developed a lump in his left Achilles that required him to lie in bed, ice and rest his Achilles, and take ibuprofen. (Filing No. 85-13, Dep. Neylon at 100:10-16.)

31.     On November 4, 2016, Neylon again saw Dr. Cerny, to whom he reported a history of a work-related injury to his left ankle and Achilles:

L ankle pain for over a year - works on the railroad and describes boarding a car last year and felt, heard a pop in back of ankle. Reports immediate pain but was able to walk. Has been "rolling" his ankle multiple times a day due to instability since then. Now feels tenderness to light touch at achilles tendon and a "lump" there which seems to have developed over time.

(Filing No. 86-1 at CM/ECF p. 2; Filing No. 85-14, Dep. Cerny at 17:11-20:2.)

32.     Dr. Cerny's physical exam revealed that Neylon's left Achilles tendon was thickened distally and demonstrated tenderness to light touch. (Filing No. 85-14, Dep. Cerny at 20:3-25; Filing No. 86-1 at CM/ECF p. 2.)

33.     Dr. Cerny diagnosed Neylon with "Achilles tendonitis. . . . due to the lump on the Achilles, suspected previous Achilles tendon disruption. And the lump is now scarring on the Achilles." Dr. Cerney testified that a tendon "disruption" is "typically an acute injury [that] doesn't cause a lump right away. That's a . . . chronic, later-on manifestation of an acute injury . . . ." Dr. Cerny opined that the "disruption" was "likely" related to the incident where Neylon felt the pop in the back of his ankle "with recurrent injury after that." (Filing No. 85-14, Dep. Cerny at 21:1-23; Filing No. 86-1 at CM/ECF p. 2.)

34. Because this was "a surgical condition," Dr. Cerny referred Neylon to orthopedic surgeon Dr. Jason Weber and provided Neylon with a note restricting him from work until further evaluation by Dr. Weber. (Filing No. 85-14, Dep. Cerny at 21:8-22:14; Filing No. 86-1at CM/ECF pp. 2-3; Filing No. 85-23.)

**Neylon's Late Report and Notice of Investigation Hearing**

35.     The same day as his doctor visit, on November 4, 2016, Neylon went to BNSF and provided Dr. Cerny's note to Terminal Manager Evan Snyder. They spoke on the phone later in the day and Neylon said he first noticed something in June 2015

when he felt a pop in his left Achilles. (Filing No. 85-13, Dep. Neylon at 104:10-106:20, 109:17-19, 128:18-129:3, 130:3-14.)

36.    November 4, 2016, was the first time Neylon reported an Achilles injury to a BNSF supervisor. (Filing No. 85-13, Dep. Neylon at 100:10-16.)

37.    Upon receipt of Dr. Cerny's note, BNSF approved Neylon's request for a medical leave of absence from November 4, 2016, through January 2, 2017. (Filing No. 85-15 at CM/ECF p. 1.)

38.    On November 6, 2016, Neylon spoke by telephone with Terminal Superintendent Allen Wolfe, who told Neylon to complete a personal-injury report. (Filing No. 85-13, Dep. Neylon at 107:11-109:19.)

39.    On November 11, 2016, Neylon saw Dr. Weber and reported a history of sharp left-ankle pain after stepping onto a train engine 18 months earlier and experiencing intermittent pain that was worse with activity and relieved by rest. (Filing No. 85-13, Dep. Neylon at 87:16-89:20.)

40.    That same day, Neylon spoke with Superintendent Wolfe who told Neylon he would be in the office on Monday, November 14, 2016. (Filing No. 85-13, Dep. Neylon at 109:20-110:15.)

41.    On November 11, 2016, BNSF issued Neylon a notice of investigation hearing for "the purpose of ascertaining the facts and determining your responsibility, if any, in connection with your alleged late/non-report and your alleged failure to comply with instructions issued to you by Terminal Superintendent Allen Wolfe on November 6, 2016, in which you were instructed to complete the prescribed injury reporting form." (Filing No. 85-17 at CM/ECF p. 1.)

42.    Neylon received the notice of investigation before he completed his

personal-injury report. (Filing No. 85-13, Dep. Neylon at 115:4-25; Filing No. 85-17.)

43.    On November 14, 2016, Neylon went to the BNSF Terminal and completed a personal-injury report. (Filing No. 85-13, Dep. Neylon at 110:16-111:22.)

44.    On Neylon's personal-injury report, he indicated the injury happened at work in "June 2015." Neylon's responses to various questions on the report were as follows:

| QUESTIONS ON INJURY REPORT | NEYLON'S ANSWER ON REPORT |
|---|---|
| "Date of Injury" | "June 2015" |
| "If this is an illness or condition rather than an acute injury, when did you first notice symptoms?" | "June 2015" |
| "When were you first treated or diagnosed?" | "Nov. 11 2016" |
| "Describe fully how injury, illness or condition occurred:" | "Stepped up on engine and felt a pop in left leg." |

(Filing No. 85-13, Dep. Neylon at 112:24-114:14; Filing No. Ex. 85-25.)

45.    Neylon's investigation hearing was postponed three times at the request of his union representative, Ronald Trauernicht. (Filing Nos. 85-18 to 85-20; Filing No. 85-35, Dep. Trauernicht at 14:23-15:9.)

**Neylon's Investigation Hearing and Dismissal**

46.    On January 4, 2017, BNSF held the investigation hearing. (Filing No. 85-16; Filing No. 85-20.)

47.     Assistant Terminal Superintendent Donald Smith was the conducting officer, Superintendent Wolfe was the company's witness, and Trauernicht provided union representation to Neylon. (Filing No. 85-16 at 2:1-3:10, 4:5-17; Filing No. 85-35, Dep. Trauernicht at 12:12-16.)

48.     Neylon and Trauernicht were allowed to question BNSF's witness, call witnesses, offer and object to evidence, and make closing statements. Neylon was allowed to testify. (Filing No. 85-13, Dep. Neylon at 119:19-121:1, 122:8-16; Filing No. 85-16; Filing Nos. 85-17 to 85-30; Filing No. 85-35, Dep. Trauernicht at 17:1-9, 18:6-25.) Neylon maintains that this process was not neutral, fair, or independent. (Filing No. 95 at CM/ECF p. 11.)

49.     During the investigation hearing, Neylon denied reporting a work-related "injury" on November 4, 2016, and instead contended that he reported a "condition." (Filing No. 85-16 at 50:24-57:20, 62:9-63:17, 63:26-64:7, 65:8-16, 73:15-17.)

50.     On January 10, 2017, BNSF granted Neylon an extension of his medical leave of absence from January 3, 2017, through February 1, 2017. (Filing No. 85-15 at CM/ECF p. 2.)

51.     After reviewing the investigation hearing transcript and exhibits, Assistant Superintendent Smith believed the evidence showed that Neylon late-reported an injury by 17 months and did not comply with Superintendent Wolfe's instructions to complete a personal-injury report when instructed to do so. (Filing No. 85-1, Decl. D. Smith ¶¶ 5, 7.)[5]

_____

[5]Neylon repeatedly objects to Defendant's proposed facts regarding the administrative hearing process because it is a "charade, the purpose of which is to sustain discipline regardless of an employee's actual responsibility for the alleged violations." (Filing No. 95 at CM/ECF p. 11.) This argument does not properly controvert Defendant's proposed material facts because BNSF has accurately cited the declarations of the decision-makers about what they reviewed, their beliefs about what

52.     Assistant Superintendent Smith also believed there was evidence to warrant a separate investigation hearing into whether Neylon was dishonest in his personal-injury report because "there were contradictions in reporting a specific, actionable event as an injury that occurred in June 2015 on his personal injury report and denying that he experienced an injury during his testimony at the formal investigation." (Filing No. 85-1, Decl. D. Smith ¶ 5.)

53.     On January 11, 2017, Assistant Superintendent Smith made his discipline recommendation to BNSF's Labor Relations Department in Ft. Worth, Texas. (Filing No. 85-1, Decl. D. Smith ¶ 5.)

54.     Assistant Superintendent Smith recommended Neylon's dismissal consistent with the PEPA because his employee transcript showed Neylon was currently within a review period for a prior Level-S violation at the time he committed the additional Level-S violations for late-reporting an injury and failing to comply with instructions. (Filing No. 85-1, Decl. D. Smith ¶ 5.)

55.     Kathleen Maglisceau, BNSF Director of Employee Performance in Labor Relations, also reviewed the investigation-hearing transcript and exhibits to confirm that any recommended discipline was supported by sufficient evidence in the record. (Filing No. 85-2, Decl. K. Maglisceau ¶¶ 1, 7-11.)

56.     On January 13, 2017, Director Maglisceau agreed with the recommendation of dismissal based on a second Level-S violation for late-reporting an injury. She did not agree with the recommendation of discipline related to Neylon's failure to comply with Superintendent Wolfe's instructions because the circumstances

---

rules were violated, and their recommendations and decisions regarding rules violations and discipline. Neylon's disagreement with the decision-makers and the process they followed does not create a factual dispute about what the decision-makers reviewed, believed, recommended, and decided.

reflected in the transcript were unclear. (Filing No. 85-2, Decl. K. Maglisceau ¶¶ 9, 11.)

57.     Director Maglisceau also disagreed with the recommendation that a separate investigation was warranted to determine whether Neylon was dishonest when he completed his personal-injury report. (Filing No. 85-2, Decl. K. Maglisceau ¶ 12.)

58.     Janssen Thompson, then General Manager for the Heartland Division, also reviewed the investigation-hearing transcript and exhibits because he had the responsibility to make the final determination as to what discipline to impose. (Filing No. 85-3, Decl. J. Thompson ¶ 6.)

59.     On January 16, 2017, then General Manager Thompson agreed with the recommendations to dismiss Neylon for a second Level-S violation within a review period for late-reporting an injury. He did not assess discipline for Neylon's failure to comply with Superintendent Wolfe's instructions to complete a personal-injury report, and he did not issue a second Notice of Investigation to determine whether Neylon was dishonest in his personal-injury report. (Filing No. 85-3, Decl. J. Thompson ¶¶ 6, 10, 11.)

60.     On January 17, 2017, BNSF notified Neylon of his dismissal for late report/failure to report a personal injury in violation of GCOR 1.1.3, 1.2.5, 1.2.7, and 1.6. In assessing discipline, consideration was given to his discipline record under the PEPA. (Filing No. 85-31.)[6]

---

[6]I have elected to delete Defendant BNSF's proposed facts regarding Neylon's OSHA proceedings. BNSF argues that OSHA's findings are relevant to issues of failure to exhaust administrative remedies and the statute of limitations. However, BNSF made such arguments only with regard to Neylon's section 20109(c)(2) claim, which has been dismissed. (Filing No. 84 at CM/ECF pp. 17-20.) Therefore, the details of the OSHA proceedings are not relevant here.

## District Court Complaint and Deposition

61.    On June 30, 2017, Neylon initiated this case in federal court, alleging an injury-reporting claim under 49 U.S.C. § 20109(a)(4) and a medical-treatment claim under 49 U.S.C. § 20109(c)(2). (Filing No. 1, Complaint.)

62.    At his May 25, 2018, deposition, Neylon testified that he did not report a work-related "injury" to BNSF, but he instead reported a "condition." (Filing No. 85-13, Dep. Neylon at 111:11-17, 113:19-114:22, 127:6-10, 128:1-6, 172:1-6.)

63.    The reason it was important to Neylon that his report not be considered an injury report was due to his concern of late-reporting after he received the notice of investigation. (Filing No. 85-13, Dep. Neylon at 114:15-115:18.)

64.    Responding to counsel's deposition question asking "if BNSF considered . . . the incident in June of 2015 an injury, [would] reporting it 17 months later . . . be a violation of the rules," Neylon testified that "[i]f I were to have an acute injury on a specific day, a year and a half later that would be a violation of the rules if I did not report it." (Filing No. 85-13, Dep. Neylon at 172:7-14.)

65.    Neylon could not identify anyone who claims to have been disciplined because of an injury. (Filing No. 85-13, Dep. Neylon at 170:19-22.)

## Comparators

66.    From 2015 through 2016, BNSF had 40 reported injuries by Transportation Department employees, including Neylon, in the Nebraska and Heartland Divisions. (Filing No. 86-2.)[7]

---

[7]As discussed in footnote 4, Neylon's objections to proposed material facts regarding BNSF's comparator evidence are overruled.

67.     As of May 1, 2017, of the 40 reported injuries, only nine employees had received discipline sometime after reporting an injury. (Filing No. 86-2 at pp. 4, 10, 15-16, 22, 32-33, 41, 47, 51, 81.) For seven of those nine employees, the discipline was not related in any way to the circumstances of the previously reported injury, and the discipline occurred six to 18 months later. (Filing No. 86-2 at pp. 4, 15-16, 22, 32-33, 41, 47, 51.) For two of the nine employees who were disciplined after reporting an injury, including Neylon, the discipline was imposed for late-reporting. (Filing No. 86-2 at pp. 10, 81.)[8]

## Decision of Public Law Board No. 7880

68.     Neylon appealed his dismissal to a pubic law board, which issued a decision reinstating Neylon to service without backpay. Neylon filed this decision with the court in Plaintiff's Notice of Supplemental Authority (Filing No. 125-1). The decision was not accompanied by an affidavit made on personal knowledge, setting forth facts that would be admissible in evidence, and showing affirmatively that the affiant was competent to testify to the matters stated, as required by Fed. R. Civ. P. 56(c)(4) and NECivR 7.1(a)(2)(C). Neylon later sought to authenticate the board's decision by filing a sworn declaration (Filing No. 129-1) affirming that counsel obtained the board's decision from Neylon and that it is a "true and accurate copy." However, Neylon's counsel did not actually attach the decision to the declaration as

---

[8]I have not included any of Neylon's proposed facts (Filing No. 95 at CM/ECF pp. 17-18) in the court's recitation of the undisputed material facts because they generally consist of Neylon's theory that the railroad industry fosters a retaliatory culture rather than "pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials," NECivR 56.1(b)(1), that contain specific facts relevant to *this particular case* showing there is a genuine issue for trial—that is, facts establishing that the decision-makers *in this case* intentionally retaliated against Neylon for engaging in protected activity. The only depositions Neylon cites for his theory that BNSF gives its supervisors an incentive to discourage injury-reporting are depositions from other cases in other courts. (Filing Nos. 96-12, 96-13, 96-14.)

Exhibit A, as represented in the declaration.[9] Consequently, the court may not consider this purported decision on summary judgment.[10] However, the court may consider the parties' judicial admission[11] that the public law board's "decision is dispositive . . . as to reinsatement," thus foreclosing Neylon's request for front pay and leaving at issue only Neylon's requests for wage loss, emotional-distress damages, punitive damages, and attorneys' fees and costs. (Filing No. 127 at CM/ECF p. 4 (Plaintiff); Filing No. 128 at CM/ECF p. 5 (Defendant).)

## III. STANDARD OF REVIEW

---

[9]Even if Neylon's counsel had attached the decision to the declaration, counsel's assertion that he received the decision from Neylon and that it is a "true and accurate copy" is not adequate to establish that the purported evidence "is that the proponent claims it is" under Fed. R. Evid. 901(a)—that is, a decision issued by Public Law Board No. 7880 in Case No. 18 by neutral member Peter R. Meyers, a named organization member, and a named carrier member on a date certain.

[10]      "To be considered on summary judgment, documents must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence. . . ." *Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 635-36 n.20 (8th Cir. 2000). The burden of authenticating evidence is on the proponent of the evidence. Fed. R. Evid. 901(a). "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a.).

*Life Inv'rs Ins. Co. of Am. v. Fed. City Region, Inc.*, 687 F.3d 1117, 1121-22 (8th Cir. 2012); *see also Shanklin v. Fitzgerald*, 397 F.3d 596, 602 (8th Cir. 2005) (party's "failure to authenticate her submissions precludes consideration of such evidence").

[11]*Postscript Enterprises v. City of Bridgeton*, 905 F.2d 223, 228 (8th Cir. 1990) (party's statement in brief and at oral argument was judicial admission that eliminated necessity for court to consider related arguments).

"Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Hess v. Union Pac. R.R. Co.*, 898 F.3d 852, 856 (8th Cir. 2018) (internal quotation marks and citations omitted); Fed. R. Civ. P. 56(a). Once the movant informs the court of the basis for its motion and identifies "the portions of the record that demonstrate the absence of a genuine issue of material fact, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial." *Hess*, 898 F.3d at 856 (internal quotation marks and citations omitted). "The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Id*. (internal quotation marks and citations omitted).

## IV. DISCUSSION

Section 20109(a)(4) of Title 49 of the United States Code provides in part:

> A railroad carrier . . . or an officer or employee of such a railroad carrier, may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done, or perceived by the employer to have been done or about to be done . . . . to notify, or attempt to notify, the railroad carrier . . . of a work-related personal injury or work-related illness of an employee . . . .

Neylon claims that BNSF violated this provision when it terminated his employment as a direct result of Neylon "reporting his left-ankle injury to BNSF." (Filing No. 1 at CM/ECF p. 5.)

To recover on a retaliation claim asserted under 49 U.S.C. § 20109(a)(4), a plaintiff must first make a prima facie case by showing that "(i) he engaged in a protected activity; (ii) [BNSF] knew or suspected, actually or constructively, that he

engaged in the protected activity; (iii) he suffered an adverse action; and (iv) the circumstances raise an inference that the protected activity was a contributing factor in the adverse action." *Hess*, 898 F.3d at 857 (internal quotation marks and citation omitted). The "contributing factor" in the fourth element requires the plaintiff-employee to prove that the discipline at issue was "at least in part" "intentional retaliation prompted by the employee engaging in protected activity." *Heim v. BNSF Ry. Co.*, 849 F.3d 723, 727 (8th Cir. 2017) (internal quotation marks and citation omitted); *see also Blackorby v. BNSF Ry. Co.*, 849 F.3d 716, 722 (8th Cir. 2017) ("a jury must find intentional retaliation prompted, at least in part, by the protected activity"). If the employee-plaintiff establishes these four elements of his prima facie case, "then he will prevail unless the carrier demonstrates by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of the employee's protected activity." *Foster v. BNSF Ry. Co.*, 866 F.3d 962, 967 (8th Cir. 2017).

BNSF moves for summary judgment on Neylon's claim, arguing that: (1) Neylon did not engage in a protected activity under this section because he asserts that he reported a work-related "condition," not an injury; (2) even if Neylon engaged in protected activity under this provision, it was not a contributing factor in his dismissal; (3) regardless of any protected activity, BNSF would have imposed the same discipline upon Neylon, as demonstrated by the investigation hearing and decision process, the injury and discipline history of Neylon and similarly-situated coworkers, and Neylon's failure to report ongoing symptoms to a BNSF supervisor; and (4) Neylon cannot state a claim for punitive damages.

## A. Protected Activity

BNSF first argues that Neylon has failed to establish the first element of a retaliation claim under 49 U.S.C. § 20109(a)(4) because Neylon repeatedly stated in deposition testimony that he reported a medical "condition"—not an "injury" or "illness," as required by the statute. BNSF contends that if Neylon denies reporting

an "injury," then Neylon did not engage in activity protected by the statute.

It is true that Neylon testified by deposition that he made a conscious decision to report a "condition" to BNSF rather than an "injury" because if BNSF considered the June 2015 incident an "injury," then Neylon reporting it 17 months later violated BNSF's late-reporting rules. (Filing No. 85-13, Dep. Neylon at 111:11-17, 113:19-115:11, 127:6-10, 172:1-14.) Neylon also maintained he was reporting a "condition" instead of an "injury" in his late-reporting investigatory hearing on January 4, 2017. (Filing No. 85-16 at CM/ECF pp. 50-57, 63-65, 73.)[12]

However, Neylon's Complaint in this court specifically states that "Neylon engaged in protected activity by reporting his left-ankle *injury* to BNSF." (Filing No. 1 at CM/ECF p. 5 (emphasis added).) The Eighth Circuit Court of Appeals has found that "even if the post-pleading evidence conflicts with the evidence in the pleadings, admissions in the pleadings are binding on the parties and may support summary judgment against the party making such admissions." *Missouri Hous. Dev. Comm'n v. Brice*, 919 F.2d 1306, 1315 (8th Cir. 1990) (admissions contained in answer were binding even where admitting party later produced evidence contrary to those admissions; "[a]dmissions in the pleadings . . . are in the nature of judicial admissions binding upon the parties, unless withdrawn or amended" (internal quotation marks and citation omitted)); *see also L.L. Nelson Enterprises, Inc. v. Cty. of St. Louis, Mo.*, 673 F.3d 799, 806 (8th Cir. 2012) ("Allegations in a complaint are binding admissions").

Therefore, Neylon is bound by his admission in his Complaint that he reported an "injury" to BNSF, thereby engaging in protected activity within the meaning of 49 U.S.C. § 20109(a)(4), and BNSF's Motion for Summary Judgment arguing to the

---

[12] Neylon's March 7, 2017, OSHA complaint describes Neylon's belief that he did not have an "injury" in June 2015 when he felt a pop in his leg. (Filing No. 85-32 at CM/ECF p. 3.) However, the remainder of the complaint repeatedly refers to Neylon's "personal injury" and his reporting thereof.

contrary is without merit.[13]

## B. Contributing Factor

BNSF next argues that Neylon's injury was not a contributing factor in his dismissal.

> To determine whether the circumstances raise an inference of retaliatory motive in the absence of direct evidence, we consider circumstantial evidence such as the temporal proximity between the protected activity and the adverse action, indications of pretext such as inconsistent application of policies and shifting explanations, antagonism or hostility toward protected activity, the relation between the discipline and the protected activity, and the presence of intervening events that independently justify discharge. We also consider evidence of the employer's nonretaliatory reasons for the adverse action.

*Hess v. Union Pac. R.R. Co.*, 898 F.3d 852, 858 (8th Cir. 2018) (internal quotation marks and citations omitted).

Here, no reasonable fact-finder could conclude that BNSF terminated Neylon's employment because Neylon reported his injury; rather, the evidence establishes that BNSF terminated Neylon's employment because Neylon *late-reported* his injury in violation of numerous BNSF employment plans, rules, and policies. Neylon has failed to submit evidence creating any inference of a retaliatory motive on BNSF's part or refuting the following evidence, all of which indicates a lack of such motive:

---

[13]No one argues that BNSF did not know or suspect that Neylon engaged in protected activity or that Neylon's termination was not an adverse action, which are the second and third elements of a retaliation claim under 49 U.S.C. § 20109(a)(4). Because neither party has argued or shown that there is a genuine issue for trial with regard to these elements, the court will treat these elements as established for purposes of the pending Motion for Summary Judgment.

▪ At the time of the events in this case, BNSF had well-established plans, rules, and policies in place making it clear that termination could occur if an employee committed a Serious Rule Violation (also known as a Level-S violation)—defined to include the late-reporting of an injury—during a "review period" for a prior violation. Specifically, BNSF's Internal Control Plan, Injury Reporting Policy, multiple General Operating Rules, and a progressive discipline policy (the "PEPA") required employees to immediately report work-related injuries and, for muscular aches and pains that did not appear serious in the first instance, to report such occurrences within 72 hours. These plans, policies, and rules provided that late-reporting of such injuries would subject the employee to a "Serious Rule Violation" and would result in a 30-day suspension and 36-month review period for the first violation and possible dismissal if another Serious Rule Violation occurred within the review period. Here, there is no question that Neylon late-reported his injury during a review period for a prior Serious Rule Violation which, according to the above plans, rules, and policies, subjected Neylon to dismissal. Neylon's deposition testimony establishes that Neylon was well aware of these rules and their implications. (Filing No. 85-13, Dep. Neylon at 172:7-14 ("[i]f I were to have an acute injury on a specific day, a year and a half later that would be a violation of the rules if I did not report it").)

▪ As to Neylon and other BNSF employees during the relevant time period, BNSF did not have a pattern of retaliating against employees for reporting an injury. In 2005, Neylon reported an off-duty, non-work-related injury to BNSF, and BNSF did not discipline him. In 2011, Neylon reported an on-duty, work-related injury to BNSF and was not disciplined. Further, Neylon could not identify anyone who claims to have been disciplined by BNSF because of an injury. To the contrary, from 2015 through 2016, BNSF logged 40 reported injuries by Transportation Department employees, including Neylon, in the Nebraska and Heartland Divisions. Of the 40 reported injuries, only nine employees received discipline sometime after reporting an injury. Seven of those nine employees received discipline that was not related in any way to the circumstances of the reported injury, and the discipline occurred six

to 18 months later. For two of the nine employees who were disciplined after reporting an injury, including Neylon, the discipline was imposed for late-reporting.

▪ Neylon conceded in his deposition that he is not claiming the BNSF employees involved in deciding whether his employment should be terminated retaliated against him for reporting a work-related injury. (Filing No. 85-13, Dep. Neylon at 134:11-140:6 (Neylon testifying that he is not claiming that Jeff Wetta, Allen Wolfe, Evan Snyder, Janssen Thompson, Kathleen Maglisceau, or Debra Rademaker retaliated against him for reporting a work-related injury).)[14]

▪ The manner in which BNSF made its termination decision reflected a deliberative, objective process, not retaliatory animus towards the reporting of a work-related injury. The three decision-makers involved—Assistant Superintendent Smith, Director Maglisceau, and General Manager Thompson—all carefully reviewed the record of the investigation, the exhibits, and the testimony of the witnesses before making their recommendations and decision. Smith's recommendation was to find a violation of rules related to both late-reporting and failure to follow instructions and to initiate a separate investigation into whether Neylon was dishonest in his personal-injury report. Maglisceau did not believe the record was clear enough to support a rule violation for failure to follow instructions or that a separate investigation into whether Neylon was dishonest in his personal-injury report was warranted. However, Maglisceau agreed with Neylon's dismissal for late-reporting. Thompson, the ultimate decision-maker, agreed with Smith and Maglisceau's recommendations to dismiss

_____

[14]As to Donald Smith, the Assistant Terminal Superintendent who conducted the investigation hearing and forwarded a disciplinary recommendation to Kathleen Maglisceau and Janssen Thompson, Neylon stated that he "would have no idea" whether he claims "that Mr. Smith retaliated against [Neylon] for reporting a work-related injury." (Filing No. 85-13, Dep. Neylon at 135:2-5.) However, the ultimate decision-maker was not Smith, but Janssen Thompson, then General Manager for the Heartland Division, who ultimately decided to terminate Neylon's employment. (Filing No. 85-3, Decl. Thompson.)

Neylon for a second Serious Rule Violation within a review period for late-reporting an injury; accordingly, he dismissed Neylon without assessing any discipline for Neylon's failure to comply with Superintendent Wolfe's instructions and without initiating a second investigation hearing regarding Neylon's dishonesty in his personal-injury report.

■ The only marginally relevant evidence of possible animus to which Neylon points is his deposition testimony that an unnamed claims agent handling his 2011 injury told Neylon that all injuries "are . . . kept on record and . . . are compounded. And multiple . . . injuries could be subject to punishment." (Filing No. 96-4, Dep. Neylon at 174:20-175:6.) This conversation between Neylon and an unknown claims representative four years before the injury at issue does not constitute evidence that the decision-makers in Neylon's specific case intentionally retaliated against him for engaging in a protected activity. Further, Neylon testified that he was not reluctant to report injuries after this alleged conversation with the unidentified claims representative. (*Id*. at 177:15-17.)

Neylon has failed to submit evidence creating a genuine issue of material fact on an essential element of his retaliation claim. As a result, and viewing the evidence in the light most favorable to Neylon, no reasonable fact-finder could conclude that the BNSF decision-makers who terminated Neylon's employment intentionally retaliated against him for filing his injury report. Therefore, summary judgment in favor of BNSF is appropriate. *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986) (summary judgment properly granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"); *Moody v. St. Charles Cnty.*, 23 F.3d 1410, 1412 (8th Cir. 1994) ("In order to withstand the motion for summary judgment, [the plaintiff] must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy." (quotations and alterations omitted)).

Because Neylon has failed to establish the elements of his injury-reporting claim under 49 U.S.C. § 20109 of the Federal Railroad Safety Act, the court need not consider BNSF's arguments regarding its affirmative defense and Neylon's entitlement to punitive damages. *Webb v. Exxon Mobil Corp.*, 856 F.3d 1150, 1157 (8th Cir. 2017) (declining to consider issue of federal preemption when claims failed under state law); *Beatty v. N. Cent. Companies, Inc.*, 282 F.3d 602, 605 (8th Cir. 2002) (when defendants were entitled to summary judgment on one ground, court "need not consider the alternative grounds defendants have urged on appeal"); *Azarax, Inc. v. Syverson*, No. CV 16-3228, __ F. Supp. 3d __, 2019 WL 3841777, at *7 (D. Minn. Aug. 15, 2019) (when summary judgment was granted on one ground, court "need not consider . . . alternate grounds for granting the motion"); *McGraw v. Wachovia Sec., L.L.C.*, 756 F. Supp. 2d 1053, 1064 (N.D. Iowa 2010) (if claims were not timely, court "need not consider any part of the record pertaining to . . . any of the other issues raised in the parties' motions").

Accordingly,

IT IS ORDERED:

1.    Defendant's Motion for Summary Judgment (Filing No. 118) as to Plaintiff's injury-reporting claim under 49 U.S.C. § 20109(a)(4) of the Federal Railroad Safety Act is granted;

2.    Pursuant to this court's previous Memorandum and Order (Filing No. 110) granting Defendant's Motion for Summary Judgment (Filing No. 83) as to Plaintiff's medical-treatment claim under 49 U.S.C. § 20109(c)(2) for the reason that Plaintiff abandoned such claim, and pursuant to this Memorandum and Order granting Defendant's Motion for Summary Judgment (Filing No. 118) as to Plaintiff's injury-reporting claim under 49 U.S.C. § 20109(a)(4), judgment shall be entered by separate document; and

3. Defendant's Motion to Strike Plaintiff's Reply (Filing No. 130) is denied as moot for the reason that the court did not consider any portion of Plaintiff's Reply that strayed from the merits of this case.

DATED this 4th day of September, 2019.

BY THE COURT:

s/ *Richard G. Kopf*
Senior United States District Judge